IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

Eastern District of Kentucky
FILED

OCT 29 2024

AT COVINGTON
Robert R. Carr
CLERK U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* DANIEL FOSTER,<br><br>Plaintiff-Relator,<br><br>v.<br><br>BOGE RUBBER & PLASTICS USA, LLC,<br><br>Defendant. | CIVIL ACTION FILE<br>No. 2:24-cv-179-DLB-CJS<br><br>**FILED UNDER SEAL**<br>**31 U.S.C. § 3730(b)(2)**<br>**DO NOT SERVE DEFENDANT**<br><br>JURY TRIAL DEMANDED |

## FALSE CLAIMS ACT *QUI TAM* COMPLAINT

*Qui tam* relator Daniel Foster ("Relator"), on behalf of himself and the United States of America, brings this action to recover civil damages, penalties, and other available remedies and relief for violations of the federal False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA" or the "Act") by Defendant BOGE Rubber & Plastics USA, LLC ("BOGE" or "Defendant").

### INTRODUCTION

1.

Through this *qui tam* action under the False Claims Act, Relator shows that Defendant defrauded the United States Government out of approximately $4.6 million in connection with the Paycheck Protection Program ("PPP").

2.

The evidence of Defendant's scheme and misrepresentations is straightforward and well documented. Defendant was ineligible for first- and second-draw PPP loans because, among other reasons, it and its affiliates employ too many people, and it is a government-owned entity controlled by the People's Republic of China ("PRC").

3.

Nevertheless, in 2020 and 2021, Defendant applied for and received more than $4.5 million in PPP loan proceeds. Defendant knowingly and willfully accepted funds for which it was not eligible, relying upon material misrepresentations about its business structure, ownership, and affiliates in order to obfuscate its ineligibility and receive funds to which it was not entitled.

4.

When Defendant's PPP loans were forgiven, the U.S. Small Business Administration ("SBA") reimbursed the lender for the full amount of the principal, interest, and loan processing fees, all at Government expense. Thus, Defendant knowingly defrauded the United States of America and violated the False Claims Act by applying for and accepting PPP loans and loan forgiveness.

## PARTIES

### 5.

Relator Daniel Foster is a resident of New York City and Berlin, Germany. As the founder of a legal technology company specializing in intellectual property theft detection and management, Relator gained extensive experience in digital investigations, computer forensics, evidence gathering, and corporate fraud. Relator also holds a certificate in forensic accounting and fraud examination as well as a specialization certificate in digital forensics. He used this experience and these digital investigative skills, as well as his knowledge of the German language, to obtain and review voluminous documents, including German and Chinese corporate records, showing that Defendant fraudulently obtained PPP loans in violation of PPP program rules relating to size, structure, affiliation, and government ownership. He brings this action as a Relator, on behalf of the United States of America.

### 6.

Defendant BOGE Rubber & Plastics USA, LLC is a Delaware limited liability company that is headquartered in and maintains its principal place of business in the Eastern District of Kentucky, at 1102 Aviation Blvd., Hebron, Boone County, Kentucky 41048. Its registered agent is Kentucky Lenders Assistance, Inc., located at 828 Lane Allen Rd., Suite 219, Lexington, Fayette

County, Kentucky, 40504. It is subject to personal jurisdiction in this judicial district and division.

## JURISDICTION AND VENUE

### 7.

This Court has original subject-matter jurisdiction over this action, which arises under the federal False Claims Act, pursuant to 28 U.S.C. §§ 1331 & 1345 and 31 U.S.C. § 3732.

### 8.

Venue for this action is appropriate in this Court, and this Court can exercise personal jurisdiction over Defendant, pursuant to 28 U.S.C. § 1391(b)(1) and 31 U.S.C. § 3732(a) because Defendant resides, transacts business, and can be found (through its registered agent) in Lexington, Fayette County, Kentucky, which is within this judicial district and division.

### 9.

To the best of Relator's knowledge, information, and belief, no other person has filed an FCA action against Defendant based on the facts alleged in this Complaint. However, to the extent this case could be deemed to be a "related action" based on facts underlying an existing *qui tam* FCA action pending at the time of the filing of this action, as set forth in 31 U.S.C. § 3730(b), said factual allegations in common with any pending action that would cause this case to be

a "related action" are hereby expressly excluded from this action, but only to the limited extend necessary to avoid statutory preemption.

10.

To the best of Relator's knowledge, information, and belief, the allegations and transactions set forth herein are not the subject of any civil suit or administrative civil money penalty proceeding in which the Government is already a party. However, to the extent the allegations or transactions referred to herein are the subject of any such civil suit or administrative civil money penalty, then said allegations or transactions are expressly excluded, but only for the specific time periods and specific allegations or transactions that are already the subject of the civil suit and/or administrative civil money penalty proceeding, such that this case is not barred by 31 U.S.C. § 3730(e)(3).

11.

The facts and circumstances of Defendant's FCA violations have not been publicly disclosed in any criminal, civil, or administrative hearing, nor in any congressional, administrative, or General Accounting Office or Auditor General's report, hearing, audit, or investigation, or in the news media. This action is therefore not barred by or subject to dismissal under 31 U.S.C. § 3730(e)(4)(A). To the extent any of the facts and circumstances alleged herein have been publicly

disclosed, Relator is an "original source" within the meaning of 31 U.S.C.

§ 3730(e)(4)(B)

12.

Pursuant to 31 U.S.C. § 3730(b)(2), Relator will serve on the Attorney

General of the United States and the United States Attorney for the Eastern

District of Kentucky a copy of the complaint and written disclosure of

substantially all material evidence and information Relator possesses.

13.

Pursuant to 31 U.S.C. § 3730(b), this Complaint is to be filed in camera and

remain under seal for at least sixty days and shall not be served on Defendant

until the Court so orders. The Government may elect to intervene and proceed

with the action within sixty days after the Government receives the Complaint,

or at such other time that the Court may order.

## LEGAL AND REGULATORY FRAMEWORK

### *The False Claims Act*

14.

The False Claims Act makes it illegal to knowingly present, make, or use

(or cause to be presented, made, or used) a false or fraudulent claim for payment.

31 U.S.C. § 3729(a)(1)(A), (B).

15.

The FCA further prohibits having possession, custody, or control of property or money used or to be used by the Government and knowingly delivering (or causing to be delivered) less than all of that money or property. 31 U.S.C. § 3729(a)(1)(D).

16.

A "knowing" violation of the FCA is one done with "actual knowledge" of a claim's falsity or one done in "deliberate ignorance" or "reckless disregard" of the truth or falsity of the claim. The FCA does not require a specific intent to defraud for liability to attach. 31 U.S.C. § 3729(b)(1).

17.

The term "claim" is broadly defined under the Act. It includes "any request or demand . . . for money . . . presented to an officer, employee, or agent of the United States," but it is not limited to requests for money made directly to the Government. 31 U.S.C. § 3729(b)(2)(A)(i). A "claim" also includes a request for money or property that "is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for

- 7 -

any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A)(ii).

18.

Finally, the Act defines "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

19.

A defendant who violates the FCA is liable for civil penalties,[1] treble damages, and costs and fees. 31 U.S.C. § 3729(a)(1), (3).

20.

The standard of proof under the FCA is preponderance of the evidence. 31 U.S.C. § 3731(d).

---

[1] The statutory text provides for "a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990," Pub. L. No. 101-410, 104 Stat. 890 (1990). Currently, for civil penalties assessed after February 12, 2024, whose associated violations occurred after November 2, 2015, the civil monetary penalties under the FCA range from a minimum of $13,946 to a maximum of $27,894 per violation. Civil Monetary Penalties Inflation Adjustments for 2024, 89 Fed. Reg. 9,764-01, 9,766 (Feb. 12, 2024) (to be codified at 28 C.F.R. pt. 85). This civil penalty range is updated on an annual basis.

*The CARES Act and the Paycheck Protection Program*

*Overview of the CARES Act and Paycheck Protection Program*

21.

In March 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic.

22.

One source of relief provided by the CARES Act was the authorization of forgivable loans to businesses through the Paycheck Protection Program ("PPP"). PPP loans were made available to assist small businesses struggling to meet payroll and other expenses as a result of the ongoing pandemic. Thus, borrowers were required to spend loan proceeds on employee compensation, rent or mortgage payments, or other specified expenses.

23.

The PPP program was established under Section 1102(a)(2) of the CARES Act and subsequently amended and clarified through other laws, including the Paycheck Protection Program Flexibility Act of 2020, Pub. L. 116-142, enacted in June 2020, and the Economic Aid to Hart-Hit Small Businesses, Nonprofits, and Venues Act, Pub. L. 116-260, enacted in December 2020.

24.

PPP loans are underwritten, approved, and initially funded by participating lenders and 100% guaranteed by the Small Business Administration ("SBA"). Congress established the SBA to aid and protect small-business concerns by authorizing the SBA, among other powers, to lend money to small businesses whenever they cannot obtain necessary loans on reasonable terms from private lenders. *See* 15 U.S.C. §§ 631(a) & 633(a); *SBA v. McClellan*, 364 U.S. 446, 447 (1960).

25.

If the applicant complied with PPP program rules and used the PPP loan for qualifying expenses, the applicant could apply for forgiveness of the loan.

26.

Borrowers were required to submit applications for PPP loans and additional applications for PPP loan forgiveness, which were signed by representatives of the business. These applications required borrowers to acknowledge program rules and make certain affirmative certifications about eligibility for loans or loan forgiveness (as applicable).

27.

If a borrower's PPP loan is forgiven, it is relieved of any obligation to repay the loan, and the SBA reimburses the participating lender, at Government

expense, and bears 100% of the loan amount, plus forgiven interest and loan processing fees. Thus, false representations on PPP applications are directly linked to the disbursement of Government funds.

*PPP Loan Eligibility Requirements*

28.

PPP loans were available in two tranches. "First Draw" PPP loans were the initial round of loans made available to businesses starting in April 2020. "Second Draw" PPP loans were introduced in December 2020 in order to provide additional support to businesses that continued to experience revenue loss despite having already received a First Draw loan.

29.

In order to be eligible to receive a PPP loan, borrowers were required to meet certain eligibility criteria that are spelled out in statutes, regulations, and other guidance issued by the SBA. First and Second Draw PPP loans were subject to different eligibility criteria, although some requirements were applicable to both. *See generally* Business Loan Program Temporary Changes, Paycheck Protection Program, 85 Fed. Reg. 20,811 (April 15, 2020) (to be codified at 13 C.F.R. pt. 120) (discussing eligibility criteria for PPP loans at inception of the program); Business Loan Program Temporary Changes, Paycheck Protection

Program Second Draw Loans, 86 Fed. Reg. 3,712 (Jan. 14, 2021) (to be codified at 13 C.F.R. pts. 120 and 121) (discussing eligibility criteria for Second Draw loans).

30.

For all loans provided by the SBA pursuant to Section 7(a) of the Small Business Act, including both First and Second Draw PPP loans, the borrower must qualify as a "small business concern," meaning, among other things, that it must be "independently owned and operated." 15 U.S.C. § 632(a)(1).

31.

Under existing SBA rules, certain types of businesses identified in 13 C.F.R. § 120.110 were expressly declared ineligible for SBA loans, including First Draw and Second Draw PPP loans. Consistent with the requirement above that PPP borrowers must be independently owned and operated, one group of businesses declared ineligible for PPP loans are "[g]overnment-owned entities (except for businesses owned or controlled by a Native American tribe)." 13 C.F.R. § 120.110(j). The SBA confirmed this on April 15, 2020. 85 Fed. Reg. at 20,812 ("How do I determine if I am ineligible?").

32.

For both First and Second Draw PPP loans, a business had to satisfy specific size standards to be eligible to receive PPP funds. *See* 15 U.S.C. § 632(a)(2)(A) & (B) (directing the SBA to establish size standards measured by

"number of employees, dollar volume of business, net worth, net income, a combination thereof, or other appropriate factors" to assess whether a business qualifies as a "small business concern" for purposes of 7(a) loans, including PPP loans).

33.

For First Draw PPP loans, a business could qualify as a "small business concern" based on its number of employees, based on its annual revenue (for certain industries), or based on a combination of its net worth and net income. 13 C.F.R. § 121.301(a) & (b).

34.

There were two different ways a business could meet the eligibility size standard for First Draw loans based on its number of employees. First, a business was considered small if it, together with its affiliates, employed an average of no more than 500 employees during 2019 or during the 12 months prior to applying for a first draw PPP loan. 15 U.S.C. § 636(a)(36)(D)(i)(I) (setting a 500-employee cap); *see also* Paycheck Protection Program Loans, Frequently Asked Questions (Apr. 6, 2020)) ("FAQs (April 2020)"), at Question 14 (explaining time period over which employee-based size standard is measured). Alternatively, the SBA set size standards for certain sectors based on the North American Industry Classification System ("NAICS") code for a business's primary industry. Even if

a business had more than 500 employees, it could still qualify as small if it

employed no more than the maximum number of employees or revenue listed in

13 C.F.R. § 121.201 for its NAICS code. 15 U.S.C. § 636(a)(36)(D)(i)(II); *see also*

FAQs (April 2020) at Question 2.[2]

35.

If qualifying for a First Draw PPP loan based on the alternative size

standard of net worth and net income, a business originally had to have both $5

million or less in average net income after federal taxes for the prior two years

and a tangible net worth of $15 million or less. *See* FAQs (April 2020) at Question

2.

36.

Eligibility for Second Draw PPP loans was, generally speaking, more

narrow than eligibility for First Draw PPP loans. *See* 86 Fed. Reg. at 3713 ("In

general, the Economic Aid Act made the eligibility requirements for Second

Draw PPP Loans narrower than the eligibility requirements for First Draw PPP

Loans."). An applicant for a Second Draw PPP loan could qualify as an eligible

small business only if (1) it had no more than 300 employees on average during

---

[2] Certain industries' size standards in 13 C.F.R. § 121.201 are measured in annual revenue rather than employee headcount. However, the two NAICS codes that Defendant claimed on its PPP loan applications are subject only to employee-based size standards, so the revenue-based size metrics are not relevant to this case.

the 12 months preceding its loan application or during the period it used to calculate average monthly payroll; *and* (2) its revenue during any quarter of 2020 was at least 25 percent lower than in the corresponding quarter in 2019. 15 U.S.C. § 636(a)(37)(A)(iv); *see also* SBA PPP Second Draw Borrower Application Form (Mar. 18, 2021), at "Instructions."

37.

For purposes of determining the size of a business applying for a PPP loan, the applicant was considered together with its "affiliates." *See* Affiliation Rules Applicable to U.S. Small Business Administration Paycheck Protection Program (effective April 3, 2020). Those affiliation rules were waived with respect to eligibility for certain types of businesses applying for First and Second Draw PPP loans, but continued to apply except to the extent waived. 15 U.S.C. § 636(a)(36)(D)(iv) (waiver of affiliation rules for certain businesses with respect to eligibility for First Draw PPP loans); 15 U.S.C. § 636(a)(37)(E) (extending the same waiver of affiliation rules applicable to First Draw loans to Second Draw loans). Defendant does not fall within any of the categories of businesses for which the affiliation rules were waived. Thus, Defendant was subject to, and required to comply with, the SBA's affiliation rules with respect to First and Second Draw PPP loans.

38.

The SBA's affiliation rules provide that "[c]oncerns and entities are affiliates of each other when one controls or has the power to control the other, or a third party or parties controls or has the power to control both." Additionally, a business concern is deemed to be "an affiliate of an individual, concern, or entity that owns or has the power to control more than 50 percent of the concern's voting equity." *Id.*

39.

As shown below, Defendant did not satisfy the eligibility criteria. By virtue of its ownership and control by the PRC, Defendant is not "independently owned and operated." As a government-owned entity, Defendant is excluded from the PPP under 13 CFR § 120.110. And, at all times relevant to this action, including at the time it applied for and received its First and Second Draw PPP Loans, and when it received forgiveness of those loans, Defendant did not satisfy the applicable size standards.

*PPP Loan Application Process*

40.

In order to obtain a First Draw PPP loan, an eligible business had to sign and submit to a private lender a PPP loan application (SBA Form 2483), generally online through the lender's application platform.

41.

The First Draw PPP loan application form required an applicant to, among other things, state its number of employees and identify all owners of 20% or more of the applicant's equity.

42.

The First Draw PPP loan application also required the business to acknowledge the PPP program rules and make certain affirmative certifications to be eligible for the PPP loan.

43.

Among other things, the PPP loan applicant had to certify the following statements were true:

a. "The applicant is eligible to receive a loan under the rules in effect at the time this application is submitted . . . ."

b. "All SBA loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rule."

c. "Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant."

- 17 -

d. "I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud."

e. "I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects."

f. "I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including . . . if submitted to a federal insured institution, under 18 U.S.C. 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000."

44.

The application form for Second Draw PPP loans was different from the First Draw application form and required more detailed information from an applicant, including the applicant's NAICS code and information about its gross receipts in one quarter of 2020 and the same reference quarter in 2019. On the Second Draw application form, the box for "Number of Employees" specifically instructed applicants to "includ[e] affiliates, if applicable" and noted that the total number of employees "may not exceed 300," unless a particular exception with no applicability to Defendant applied.

45.

The Second Draw application form also required the following certification regarding affiliation:

> The Applicant, together with its affiliates (if applicable), (1) is an independent contractor, self-employed individual, or sole proprietor with no employees; (2) employs no more than 300 employees; or (3) if NAICS 72, employs no more than 300 employees per physical location; (4) if a news organization that is majority owned or controlled by a NAICS code 511110 or 5151 business or a nonprofit public broadcasting entity with a trade or business under NAICS code 511110 or 5151, employs no more than 300 employees per location.

*Id.* at p.3 (third bullet point).

46.

The rules for the Second-Draw program explicitly forbade Chinese-owned companies from receiving Second Draw PPP loans. 15 U.S.C. § 636(a)(37)(A)(iv)(III)(cc) (excluding from the definition of "eligible entity" any business for which a Chinese company "owns or holds, directly or indirectly," 20% or more of the business's economic interest, or which has a member of the board of directors who is a resident of the PRC).

47.

Thus, the Second Draw Borrower application form required the applicant to certify as follows:

> The Applicant is not a business concern or entity (a) for which an entity created in or organized under the laws of the People's

Republic of China or the Special Administrative Region of Hong Kong, or that has significant operations in the People's Republic of China or the Special Administrative Region of Hong Kong, owns or holds, directly or indirectly, not less than 20 percent of the economic interest of the business concern or entity, including as equity shares or a capital or profit interest in a limited liability company or partnership; or (b) that retains, as a member of the board of directors of the business concern, a person who is a resident of the People's Republic of China.

48.

The Second Draw application form further required borrowers to expressly certify that "[t]he applicant, together with its affiliates (if applicable) . . . employs no more than 300 employees" or was otherwise eligible for a Second Draw PPP loan under other specific rules applicable to particular types of businesses.

49.

Once the borrower submitted its PPP loan application to a participating lender, the lender processed the loan application. If a PPP loan application was approved by the lender, it thereafter funded the PPP loan using its own monies, which were 100% guaranteed by the SBA.

50.

After the lender processed and approved a borrower's PPP loan application, but prior to the closing of the PPP loan, the lender submitted to the SBA the "Lender Application Form – Paycheck Protection Program Loan

Guaranty" (SBA Form 2484) applying for a guarantee on the loan. For a PPP loan to be approved, the lender was required to certify that "[t]he Applicant has certified to the Lender that the Applicant is eligible under the Paycheck Protection Rules."[3]

51.

Therefore, if a PPP borrower lied on its PPP loan application, the PPP borrower's false certification caused the lender to submit to the SBA with respect to that PPP loan an application for a loan guarantee that contained the borrower's false statement.

52.

After receiving a PPP loan, a borrower could subsequently apply for forgiveness of that loan. To apply for forgiveness of a loan of more than $150,000, a borrower would submit to its lender either a Loan Forgiveness Calculation Form (SBA Form 3508) or a Loan Forgiveness Application Form (SBA Form 3508EZ). Both forms required the borrower to again make certain representations and certifications about eligibility, use of funds, and the truthfulness of information and documentation submitted by the borrower.

---

[3] Form 2484 was subsequently updated a number of times, but this certification remained a requirement across all versions of the form. *See* https://www.sba.gov/document/ sba-form-2484-lender-application-form-paycheck-protection-program-loan-guaranty (providing links to all nine versions of Form 2484).

DEFENDANT'S FRAUDULENT SCHEME

*Defendant Is a State-Owned Enterprise of the PRC*

53.

Although Defendant itself is a Delaware company headquartered in

Kentucky, Relator's investigation, including his review of Chinese and German

corporate records, revealed that Defendant is predominantly owned, through a

complex web of affiliate companies, by the Chinese government.

54.

Defendant is a wholly-owned subsidiary of a German holding company,

CRRC New Materials Technology GmbH, which in turn is a subsidiary of the

Chinese company Zhuzhou Times New Material Technology ("TMT").

55.

The majority shareholder of TMT, with 51.2% voting control, is the

Chinese manufacturing company CRRC Corporation Ltd. ("CRRC"). The

majority (50.73%) owner and controlling shareholder of CRRC is CRRC Group

Corp. Ltd. ("CRRCG").

56.

CRRCG is 100% owned by the State-owned Assets Supervision and

Administration Commission of the State Council ("SASAC"). SASAC is a special

commission of the PRC, directly under the PRC's State Council, which is the

chief administrative authority and the national cabinet of the PRC. SASAC is the

governmental commission responsible for managing state-owned enterprises.

57.

Under the SBA's affiliation rules applicable to the PPP program,

Defendant is an "affiliate," by virtue of equity ownership, of CRCC New

Materials Technology GmbH, TMT, CRRC, and CRRCG. By virtue of its state

ownership, Defendant is also a government-owned entity and barred from SBA

loan programs under 13 CFR § 120.110(j).

58.

Defendant is an affiliate of CRRC and CRRCG based *solely* on ownership,

even in the absence of other indicia of control (which exit here regardless), and

despite the fact that they are legally distinct corporate entities. *See Size Appeal of:*

*Industria Lechera de Puerto Rico, Inc., Appellant*, SBA No. SIZ-5533, 2014 WL

845551, *4 (S.B.A. Feb. 6, 2014).

59.

A German-language document obtained by Relator shows that CRRC New

Materials Technology GmbH, the direct German parent of Defendant, employs

approximately 3,600 people.

60.

CRRC, the Chinese parent of CRRC New Materials Technology GmbH,
boasts on its website that its 46 wholly-owned and majority-owned
subsidiaries—each of which would be deemed an "affiliate" of Defendant by
virtue of common ownership and control—employ more than 170,000
individuals. CRRC "Company Profile," available at https://www.crrcgc.cc/en/
73_5130/73_5141/index.html (last visited Sept. 27, 2024). According to its 2019
annual report, CRRC had a net profit of $13.8 billion RMB ($1.97 billion USD).

*[Remainder of this page intentionally left blank]*

61.

The illustration below is an organizational chart prepared by Relator that

summarizes the ownership and control of Defendant.



62.

When considered together with its German and Chinese affiliates,

Defendant did not meet the size eligibility criteria to obtain any PPP loan,

including the industry size standard and alternative size standard.

63.

Because Defendant is affiliated with and ultimately owned by the PRC

government, it is not "independently owned and operated," as required, in

addition to being "small," to qualify as a "small business" for SBA purposes. 15

U.S.C. § 532(a)(1); *Industria Lechera*, 2014 WL 845551 at *5 (entity whose parent

company was controlled by the Puerto Rican government was not

"independently owned and operated"). Defendant is also an ineligible entity for

SBA loan programs under 13 CFR § 120.110(j).

*Defendant Receives, and Receives Forgiveness of,*
*More than $4.5 million in PPP Loans*

64.

Despite being ineligible to receive PPP loans, Defendant applied for and

received two PPP loans, both of which were eventually forgiven in their entirety.

65.

On April 30, 2020, BOGE was approved for an initial PPP loan in the

principal amount of $2,547,600 from lender Heritage Bank, Inc. (the "First PPP

Loan").

- 26 -

66.

In connection with its First PPP Loan, Defendant indicated that the NAICS code applicable to it was 423120.[4] NAICS code 423120 is for "motor vehicle supplies and new parts merchant wholesalers," and a business under that code meets the SBA's size standards only if it employs 200 or fewer individuals. 13 C.F.R. § 121.201. Therefore, Defendant was not eligible under an industry size standard exception.

67.

At the time Defendant applied for its First PPP Loan, it alone (i.e., without taking into account its affiliates) employed well more than 500 individuals. When its affiliates, including its German direct parent company as well as its eventual Chinese ownership, are considered, as they must be, Defendant and its affiliates together employed hundreds of thousands individuals, well in excess of all potentially applicable size standards for First Draw PPP loans.

---

[4] The initial borrower application form for First Draw PPP loans did not require a borrower to identify its NAICS code, but many lenders collected that information at the time a borrower applied for a First Draw PPP loan. The Second Draw borrower application did require borrowers to identify their NAICS code, and the loan forgiveness application form (SBA Form 3508) also required that information. Thus, Defendant would have provided this NAICS code either at the time of application for the loan or the time of application for loan forgiveness.

- 27 -

68.

The First PPP Loan was forgiven in its entirety on July 21, 2021. The total amount forgiven, inclusive of interest, was $2,578,310.79.

69.

Defendant misrepresented its ownership, government affiliation, and size in connection with its application for the First PPP Loan and its application for forgiveness of the First PPP Loan. Those misrepresentations, in turn, were material to the Government's decision to satisfy its guarantee and reimburse Heritage Bank for the full amount of the First PPP Loan.

70.

On February 6, 2021, BOGE was approved for a second PPP loan, in the principal amount of $2 million, also from Heritage Bank (the "Second PPP Loan").

71.

When Defendant applied for the Second PPP Loan, it indicated that the NAICS code applicable to it was 326291. This is a different NAICS code than Defendant relied upon for its First PPP Loan.

72.

At the time Defendant applied for its Second PPP Loan, it alone (i.e., without consideration of its affiliates) employed well more than 300 individuals.

When its affiliates, including its German direct parent company as well as its eventual Chinese ownership, are considered, as they must be, Defendant and its affiliates together employed hundreds of thousands individuals, well in excess of all potentially applicable size standards for Second Draw PPP loans.

73.

The Second Draw application form prominently displayed instructions regarding affiliation in large bold font. The text label for the "number of employees" field stated: "Number of Employees (including affiliates, if applicable; may not exceed 300 unless 'per location' exception applies)." Defendant could not have filled in its number of employees without seeing these instructions, yet it intentionally and knowingly did not factor in its affiliates when stating its number of employees.

74.

Furthermore, Defendant also knew (or was deliberately indifferent or reckless in not knowing) that it was ineligible for a Second Draw PPP loan on the basis of its Chinese ownership.

75.

The Second PPP Loan was forgiven in its entirety on March 31, 2022. The total amount forgiven, inclusive of interest, was $2,022,575.34.

76.

Defendant misrepresented its ownership, government affiliation, and size in connection with its application for the Second PPP Loan and its application for forgiveness of the Second PPP Loan. Those misrepresentations, in turn, were material to the Government's decision to satisfy its guarantee and reimburse Heritage Bank for the full amount of the Second PPP Loan.

77.

The total amount of loan proceeds received by Defendant through the First and Second PPP Loans is $4,547,600.

78.

The total amount of loan forgiveness that BOGE received the benefit of is $4,600,886.13.

79.

Because BOGE's loans were forgiven, the Government, through the SBA, made an outlay of more than $4.6 million to reimburse Heritage Bank for the principal amount of the loans, the interest on the loans, the loan processing fee of $25,476.00 associated with the First Loan to BOGE, and the loan processing fee of $20,000.00 associated with the Second Loan to BOGE.

80.

The Government's expenditure of funds in connection with BOGE's PPP loans was a direct and proximate result of Defendant's knowing, material misrepresentations and omissions in its applications for the PPP loans and its applications for PPP loan forgiveness.

81.

Specifically, Defendant's PPP loan applications falsely certified that:

a. BOGE was eligible to receive a PPP loan under the SBA's rules for the program in effect at the time of the application, including rules relating to size limitations, affiliation, and government ownership.

b. BOGE, together with its affiliates, met the size eligibility rules for the PPP program.

c. Defendant would use the loan proceeds "consistent with the Paycheck Protection Program Rules."

d. Defendant, a government-owned and -controlled enterprise backed by the massive resources of the PRC, was experiencing "economic uncertainty" that rendered "this loan request necessary to support the ongoing operations of the Applicant."

e. The information provided in the loan application and supporting documentation was "true and accurate in all material respects."

82.

Defendant knowingly omitted information pertaining to its affiliates and its ownership, and it knowingly misrepresented its size-based eligibility for the PPP program.

83.

Defendant's misrepresentations and omissions on the PPP loan application were knowingly made. Defendant made them despite certifying both that the information provided was true and correct and also that the knowing use of PPP funds for unauthorized purposes and the making of false statements to obtain SBA-guaranteed loans could lead to legal liability.

**LEGAL CLAIMS**

***Count 1: False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A))***

84.

Relator incorporates by reference and re-alleges paragraphs 1 through 83 of the Complaint as if fully set forth herein.

85.

This is a claim for treble damages and civil penalties under the FCA, 31 U.S.C. § 3729(a)(1)(A).

86.

Defendant knowingly presented and caused to be presented a false or fraudulent claim for payment, specifically its applications for its First and Second PPP Loans that falsely certified Defendant was eligible to receive PPP loans, in violation of 31 U.S.C. § 3729(a)(1)(A).

87.

The borrower applications submitted by Defendant to Heritage Bank constitute a "claim" under 31 U.S.C. § 3729(b)(2)(A)(ii) because, although not submitted directly to the Government, they were requests made "to a contractor, grantee, or other recipient," for money "to be spent or used on the Government's behalf or to advance a Government program or interest," and the Government would (and eventually did) "reimburse such contractor, grantee, or other recipient" for the loan proceeds at issue.

88.

Defendant's material misrepresentations in its borrower applications also "caused" Heritage Bank, the participating lender processing and initially funding the two PPP loans in question, to make material misrepresentations (albeit unknowingly, on Heritage Bank's part) to the Government on its lender's application about Defendant's eligibility for PPP loans.

- 33 -

89.

Heritage Bank's lender's application was a "claim" under 31 U.S.C. § 3729(b)(2)(A)(i) because it was a request for money presented directly to the Government for payment. But for Defendant's knowing and material misrepresentations on its own borrower applications, Heritage Bank would not have submitted (unknowingly) false "claims" to the Government in the form of these lender applications.

90.

The United States Government, unaware of the material falsity of the claims made or caused to be made by Defendant, approved, paid, and participated in payments made by the Government's fiscal intermediaries for the PPP loans that otherwise would not have been allowed.

91.

As a direct and proximate result of the false and fraudulent claims made by Defendants, the United States Government has been damaged in the amount of at least $4.6 million.

### Count 2: False Statements (31 U.S.C. § 3729(a)(1)(B))

92.

Relator incorporates by reference and re-alleges paragraphs 1 through 83 of the Complaint as if fully set forth herein.

- 34 -

93.

This is a claim for treble damages and civil penalties under the FCA, 31 U.S.C. § 3729(a)(1)(B).

94.

Defendant knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim, which false records and statements were relied upon to get the United States to pay or approve false claims, in violation of the FCA, 31 § U.S.C. 3729(a)(1)(B).

95.

These records and statements that Defendant made and used included application forms containing false certifications that Defendant was eligible for PPP loan disbursal and PPP loan forgiveness, when in fact it was not.

96.

Defendant also caused Heritage Bank to make and use false records and statements material to a false claim, namely, its lender applications submitted to the Government in connection with the two PPP loans received by Defendant. Heritage Bank's misrepresentations to the Government were, to the best of Relator's knowledge, unknowing, but were procured and "caused" directly by Defendant's knowing misrepresentations in its own borrower applications.

- 35 -

97.

Payment of those false or fraudulent claims by the United States was a reasonable and foreseeable consequence of those statements and records that Defendant made, used, and caused to be made and used.

98.

Defendant made and used, or caused to be made and used, such false records or statements with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false. Specifically, Defendant knew that it was not eligible for its First PPP Loan or its Second PPP Loan, and it misrepresented its independent status, its ability to satisfy the SBA's size standards, and its compliance with the SBA's affiliation rules in order to obfuscate its ineligibility and ensure it would receive Government-funded loans for which it was not otherwise qualified.

99.

As a direct and proximate result of the false and fraudulent claims made by Defendant, the United States Government has been damaged in the amount of at least $4.6 million.

WHEREFORE, Relator respectfully asks this Court to:

1.    Accept this case for filing under seal until such time as it is appropriate for the Complaint to be unsealed;

- 36 -

2.    Enter judgment against Defendant for its knowing violations of the FCA;

3.    Award all damages, including liquidated and treble damages, civil penalties, relators' shares, attorneys' fees, expenses of litigation, and other relief allowed by the FCA or other applicable laws;

4.    Award Relator a relator's share at the maximum rate permitted under the FCA;

5.    Grant a trial by jury on all issues so triable; and

6.    Grant any further relief deemed necessary, proper, or just.

Respectfully submitted this __ day of October, 2024.

**BEY & ASSOCIATES, LLC**
*/s/ Anita M. Washington*
Anita M. Washington
Kentucky Bar No. 098266
312 Elm St., Ste. 1485
Cincinnati, OH 45202
513-547-4010 (Phone)
404-393-6107 (Fax)
anita@beyandassociates.com

**KREVOLIN & HORST, LLC**
Zahra S. Karinshak
*Pro Hac Vice Forthcoming*
Jennifer K. Coalson
*Pro Hac Vice Forthcoming*
One Atlantic Center
1201 W. Peachtree St., Suite 3500
Atlanta, GA 30309

(404) 888-9700 (Phone)
(404) 888-9577 (Fax)
karinshak@khlawfirm.com
coalson@khlawfirm.com